UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

DANIA HALL,

                    Plaintiff,

              -against-

NORTH BELLMORE SCHOOL DISTRICT and
NORTH BELLMORE BOARD OF EDUCATION,

                    Defendants.

----------------------------------------------------------------x

**MEMORANDUM & ORDER**

08-CV-1999 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Dania Hall, a former music teacher for the elementary school district of North Bellmore (the "School District"), claims that she was denied tenure, and then terminated, based on her age and sex, in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), § 4(a), 29 U.S.C. § 623(a), and Title VII of the Civil Rights Act of 1964 ("Title VII"), § 703(a), as amended, 42 U.S.C. § 2000e-2(a).[1]  At the outset, the Court observes that the "kitchen sink" style of briefing by the parties—which includes a *193-paragraph* Local Rule 56.1 statement of facts, a *148-paragraph* counterstatement of facts, and over *4,000 pages* of exhibits—is not only wildly disproportionate to the issues presented in this case, but, if anything,

---

[1]     Upon reconsideration of her decision on Defendants' motion to dismiss, Judge Joanna Seybert reinstated Plaintiff's ADEA and Title VII claims of age and sex discrimination. *Hall v. N. Bellmore Union Free Sch. Dist.*, No. 08-CV-1999, 2010 WL 2267399, at *1 (E.D.N.Y. May 30, 2010).  These claims, however, remained dismissed as against the individual defendants named in this case. *Id.* at *2.  Because the caption on the docket still reflects the names of the dismissed defendants, the Court respectfully directs the Clerk of the Court to amend the caption accordingly.

belies its summary judgment-worthy nature. Indeed, the Court concludes that there are genuine disputes as to material facts, and, thus, denies Defendants' summary judgment motion.

I. Background[2]

The School District consists of six different elementary schools: Newbridge Road, Park Avenue, Saw Mill Road, Jacob Gunther, John G. Dinkelmeyer, and Martin Avenue. (Defs. 56.1 ¶¶ 6, 13; Dkt. Nos. 91-1–91-63 ("Defs. Exs."), Ex. D, at 62:21-64:13.) From 1997 to 2004, the Superintendent of the School District[3] was Dr. James Parla ("Superintendent Parla"); and, from 2004 onward, at the time of Plaintiff's tenure denial and termination, the Superintendent was Dominic Mucci ("Superintendent Mucci"). (Defs. 56.1 ¶¶ 28, 30.) During that same period, the principals for the Newbridge Road and Park Avenue schools were Marilyn Hirschfield ("Principal Hirschfield") and Michael Wolk ("Principal Wolk"), respectively. (*Id.* ¶¶ 22, 24.)[4]

---

[2]     The Court construes any disputed facts in the light most favorable to Plaintiff, as the non-moving party, for purposes of Defendants' summary judgment motion. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970) (Harlan, J.). However, where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts asserted in Defendants' prolix, repetitive, and carelessly drafted Local Rule 56.1 statement (Dkt. No. 96 ("Defs. 56.1")), the Court may deem any such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d); *see also Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Sotomayor, J.) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (collecting cases). Standalone citations to "Defs. 56.1" denote that the Court has deemed certain of Defendants' asserted facts undisputed and also incorporate by reference any documents cited therein. Where relevant, however, the Court may cite directly to such documents.

[3]     The Superintendent oversees the budget, advises on policy issues, supervises the six school principals and other administrators, and is ultimately responsible for school personnel, including teachers. (Defs. 56.1 ¶ 31.)

[4]     Two other school principals, who the parties deposed, were Frances Bennett for the Saw Mill Road school ("Principal Bennett") and Laurance Anderson for the Jacob Gunther school ("Principal Anderson"). (Defs. 56.1 ¶¶ 16, 21; Defs. Ex. F, at 14:20-14:22.) The principals for the John G. Dinkelmeyer and Martin Avenue schools were Faith Skelos and Mark Weiner, respectively. (*See* Dkt. Nos. 94–94-6 ("Pl. Exs."), Ex. 6 (listing the school principals' names).)

## A. Plaintiff's Probationary Employment and Credentials

In August 2002, at the age of 56, Plaintiff was hired by the School District, specifically, Superintendent Parla, as a probationary music teacher, meaning that she would be eligible for tenure in three academic years. (Defs. 56.1 ¶¶ 3-4; Dkt. No. 95, at 71-95 ("Pl. 56.1") ¶¶ 7-8; *see* Pl. Ex. 17, at 4 (providing that teachers for the School District are "probationary and without tenure" in their "first three (3) years").)[5] Prior to being denied tenure and terminated, Plaintiff's credentials included (i) a Master of Science degree in music education, which she earned in February 2003; and (ii) several music-related certifications, including, since February 2005, a permanent music teaching certification from New York State. (Defs. 56.1 ¶ 5; Pl. 56.1 ¶ 3; Pl. Ex. 42; Pl. Ex. 68; Pl. Ex. 69.) Between 1999 and 2002,[6] Plaintiff had prior music teaching experience, albeit in non-permanent positions, with five other school districts. (Pl. 56.1 ¶¶ 4-6.)

During her time with the School District, Plaintiff taught classes in the violin, viola, cello, and bass at all six of the schools, and conducted the district-wide string orchestra. (Defs. 56.1 ¶¶ 6, 8-11; Defs. Ex. D, at 99:11-103:5.) The orchestra rehearsed at the Saw Mill Road school, and performed six daytime concerts and two evening concerts throughout the academic year. (*Ibid.*)

## B. Complaints About Plaintiff's Teaching

Principal Hirschfield, but none of the other school principals, claims to have received two complaints about Plaintiff's teaching during her second academic year (2003/2004) and one complaint during her third academic year (2004/2005). (Defs. 56.1 ¶¶ 92, 99; Defs. Ex. G, at

---

[5]     "Pl. 56.1" denotes Plaintiff's Local Rule 56.1 counterstatement of facts.

[6]     Plaintiff did not earn her Bachelor of Arts degree in music education until 2000. (Pl. 56.1 ¶ 2.)

108:14-109:2, 131:25-132:8.)   Yet, Principal Hirschfield made no effort to investigate any of these complaints.

According to Principal Hirschfield, the first complaint came in March 2004 from the mother of a special education student named Nicole.  (Defs. Ex. G, at 109:3-110:20.)[7]  Nicole's mother placed a telephone call to Principal Hirschfield to complain that Plaintiff had told Nicole that she was "clumsy" for breaking her violin, that Nicole stopped taking violin lessons from Plaintiff, and that Plaintiff nonetheless commented on Nicole's report card that she should "review the rules for care of the violin."  (*Id.* at 109:3-110:20, 111:22-112:6, 115:11-115:19; Defs. Ex. V.)  Principal Hirschfield admitted that she "only spoke to [Nicole's mother] that one time" about the complaint, and did not receive anything in writing from the mother or otherwise document the conversation that they had in support of the complaint.  (Defs. Ex. G, at 110:21-111:21, 115:1-115:2, 120:11-120:16.)  Afterward, Principal Hirschfield reported the complaint to Superintendent Parla, who personally felt that "[i]t was . . . nothing that . . . really raised a major concern."  (Pl. Ex. 4, at 25:25-26:1.)  Principal Hirschfield, however, in discussing her concerns about the complaint with Superintendent Parla, described Plaintiff as "eccentric."  (*Id.* at 26:4.)

Principal Hirschfield received the second complaint in June 2004, in the form of a one-page handwritten letter from the mother of a student named "Shoshi."  (Defs. Ex. G, at 128:19-128:25; Defs. Ex. W.)  In the letter, Shoshi's mother complained that Plaintiff had told Shoshi, in front of the entire class, that "she was not good enough" to perform a duet on the violin.  (*Ibid.*)

---

[7]      Contrary to Plaintiff's repeated statement that Principal Hirschfield's testimony is hearsay, the testimony is not being cited to prove that the parental complaints that the school principal received were true, but only to prove that these complaints were made, and, thus, is not hearsay.  *See* Fed. R. Evid. 801(c) (defining "hearsay").

Principal Hirschfield admitted that she never spoke to Shoshi's mother, and merely relied on the letter in substantiating the complaint. (Defs. Ex. G, at 128:24-129:3.)

Principal Hirschfield also received the third complaint by way of a letter, in January 2005. (*Id.* at 133:20-133:24; Defs. Ex. BB.) In the letter, the mother of a student named "Danielle" complained that her daughter was no longer interested in playing the violin, after Plaintiff told Danielle that "you really weren't that good." (Defs. Ex. G, at 132:9-132:18; Defs. Ex. BB.) Once again, Principal Hirschfield admitted that she never spoke to Danielle's mother, and merely relied on the letter in substantiating the complaint. (Defs. Ex. G, at 141:4-141:6, 256:10-256:14.) Indeed, with respect to all three parental complaints, Plaintiff argues that Principal Hirschfield made no effort to confirm the bases for these complaints with the students themselves. (Pl. 56.1 ¶¶ 94-96.)

### C. *Observations and Annual Evaluations of Plaintiff*

One of the school principals' responsibilities was to complete observations and annual evaluations of teachers, as directed by the Superintendent. (Defs. 56.1 ¶ 14; Defs. Ex. E, at 226:8-230:14.) According to Principals Anderson and Bennett, as a matter of policy, every probationary teacher was entitled to three observations and one annual evaluation *at a minimum*. (Defs. Ex. E, at 227:23-230:14; Defs. Ex. F, at 170:6-170:12.) Principal Anderson also testified that, as far as he could remember, no probationary teachers from 2000 to 2005 received fewer than the minimum number of observations and annual evaluations, and that such procedural irregularities, if any, "would grossly disadvantage that particular instructor in terms of receiving adequate administrative support and feedback, guidance, [and] mentoring." (Defs. Ex. E, at 230:17-237:4.) Similarly, though slightly less confident than her colleague, Principal Bennett testified that every probationary teacher that she knew of received at least one observation each year. (Defs. Ex. F, at 168:10-169:20.)

Plaintiff, however, points to procedural irregularities with respect to her employment: there were *no* observations of her during her first two academic years (2002/2003, 2003/2004), and *no* annual evaluation of her during her first academic year (2002/2003). (Pl. 56.1 ¶¶ 29, 32; *see* Defs. Exs. X-AA (four observations for 2004/2005, all of which were completed in February 2005); Defs. Exs. T-U (two annual evaluations for 2003/2004).) By contrast, a much younger, male music teacher, who later made tenure, *infra*, received at least *two* observations and *one* annual evaluation for 2002/2003, and *three* observations and *one* annual evaluation for 2003/2004. (Pl. 56.1 ¶ 83; Defs. Ex. KK.)

Furthermore, the only *negative* observation and annual evaluation of Plaintiff were by Principal Hirschfield, based on the three parental complaints that the school principal had fielded but did nothing to investigate. In a 2003/2004 annual evaluation, Principal Hirschfield wrote:

> On two occasions [Plaintiff] did not use her best judgment when communicating with students and their parents. It would be suggested that she consider the feelings of the child when determining their potential talent and gently inform a child if he/she doesn't meet [Plaintiff's] criteria. If a child breaks an instrument, [Plaintiff] should immediately contact the parent to clarify the continuation of lessons.

(Defs. Ex. U.)[8] Principal Hirschfield also included a complaint from Principal Wolk that Plaintiff "did not always communicate with [Wolk]" regarding Plaintiff's job-related concerns. (*Id.*)

In a 2004/2005 observation, Principal Hirschfield wrote that, during her post-observation conference with Plaintiff, Plaintiff "became upset" and raised the "problem she had with a student and parent two years ago," and that, in response to Principal Hirschfield's criticism, Plaintiff reacted in a "defensive" way. (Defs. Ex. AA.) Principal Hirschfield also wrote, "[A]s I

---

[8] Despite not having participated in the drafting of Plaintiff's 2003/2004 annual evaluation, Principal Wolk co-signed it with Principal Hirschfield. (Defs. Ex. H, at 120:7-120:13, 210:11-210:22.)

have shared with [Plaintiff] in the past, teachers should communicate clearly and effectively to ensure student success." (*Id.*)

The other 2004/2005 observations by Principals Wolk, Anderson, and Bennett, and the 2003/2004 annual evaluation by Principal Bennett, however, were positive. (Defs. 56.1 ¶¶ 87, 108.) Principal Wolk wrote that Plaintiff "did address the individual needs of each pupil," all of whom she "frequently prais[ed]." (Defs. Ex. X.) Principal Anderson wrote that Plaintiff "[p]raised [her] pupils," showed them "very positive encouragement," and "displayed significant determination in seeing the children master the challenges of the violin." (Defs. Ex. Y.) Principal Bennett wrote that Plaintiff was a "caring educator" who "encourages her students to do their very best," and that she "used positive reinforcement that encouraged the children to take risks and attempt more difficult pieces." (Defs. Ex. T; Defs. Ex. Z.)

### D. Plaintiff's Tenure Denial and Termination

In and around December 2004 and January 2005, Superintendent Mucci convened administrative meetings with the six school principals and other administrators at which they discussed the probationary teachers eligible for tenure that year. (Defs. Ex. J, at 53:17-59:10.)[9] According to Superintendent Mucci, Plaintiff was one of the teachers discussed during these meetings. (*Id.* at 59:11-59:15.) Principal Hirschfield similarly testified that the discussion regarding Plaintiff's tenure did take place during these meetings, and it revolved around "concerns that I had had, parent complaints." (Defs. Ex. G, at 89:7-89:10; *see also* Defs. Ex. F, at 155:14-155:17 (Principal Bennett testifying, "I believe [Principal Hirschfield] brought up the issue of the broken violin. And I believe she brought up how [Plaintiff] may have spoken to the

---

[9]     At these meetings, the participants considered the observations and annual evaluations of each candidate, and then would engage in further discussions with Superintendent Mucci regarding the candidates. (Defs. 56.1 ¶ 144.)

child or the parent.").)  Principal Anderson, however, testified that, while he and the other school principals should have been consulted before Plaintiff was denied tenure, he could not recall a single discussion about Plaintiff's tenure during any such meeting.  (Defs. Ex. E, at 219:8-222:2.)

On March 31, 2005, at the age of 58, Plaintiff was sent a notice regarding Superintendent Mucci's recommendation that the North Bellmore Board of Education (the "Board of Education") deny her tenure.  (Defs. 56.1 ¶¶ 4, 168.)  Plaintiff, in response to this notice, requested "[Superintendent Mucci's] reasons for that recommendation."  (Pl. Ex. 38.) Superintendent Mucci, in turn, circulated a memorandum to Principals Hirschfield and Wolk, and none of the other school principals, with respect to Plaintiff's request:

> I received notice from [Plaintiff] that she is requesting information regarding *reasons/rationale for her termination*. . . . Please take a look at the reasons below and identify those items *that you would hold as evidence for a recommendation of termination of her services.*

(Pl. Ex. 39 (emphasis added).)  Immediately below that paragraph of the memorandum, Superintendent Mucci suggested "reasons [that] have been used *in the past* to be sufficient response to a request for reasons."  (*Id.* (emphasis added).)  Plaintiff was subsequently denied tenure and terminated, effective June 30, 2005, by the Board of Education.  (Defs. 56.1 ¶ 170.)

Meanwhile, a younger, male music teacher, by the name of Edward McCullagh ("McCullagh"), whom Plaintiff called her "assistant" (Defs. Ex. D, at 345:6-345:19),[10] made tenure *at the age of 29 or 30*, after his three-year probationary period ended in 2003/2004.  (Defs. 56.1 ¶¶ 32, 40, 176; Defs. Ex. JJ.)  As of his tenure date, McCullagh's credentials included (i) a Master of Arts degree in music history, and (ii) a permanent music teaching certification.  (Defs.

---

[10]  McCullagh, however, taught wind, brass, and percussion instruments, and not string instruments like Plaintiff.  (Defs. 56.1 ¶ 44.)

56.1 ¶ 33; Defs. Ex. II.)  Between 1999 and 2001, McCullagh had prior music teaching experience in non-permanent positions with the same school district.  (Defs. 56.1 ¶¶ 35-38; Defs. Ex. K, at 32:15-33:10.)

A younger, female music teacher named Lisa Uckardes ("Uckardes"), who took over for Plaintiff in teaching string instruments and conducting the orchestra, also made tenure *at the age of 29*, after her three-year probationary period ended in 2007/2008.  (Defs. 56.1 ¶¶ 47, 50, 54.) As of her tenure date, Uckardes's credentials included (i) a Master of Arts degree in music, and (ii) a permanent music teaching certification.  (*Id.* ¶¶ 52-53; Defs. Ex. LL; Defs. Ex. OO.) Between 2002 and 2005, Uckardes had prior music teaching experience in non-permanent positions with two different school districts.  (Defs. Ex. NN.)

Indeed, Defendants have furnished a chart indicating that *all* of the probationary music teachers, who made tenure from 2002 to 2010, were, as of their tenure dates, *more than a decade younger* than Plaintiff when she was denied tenure.  (*See* Defs. Ex. PP (listing five probationary music teachers who made tenure).)  The oldest among them, Carol Ng, was 13 years Plaintiff's junior, though Ng was also over the age of 40.  (*Id.*)

### E.  Present Lawsuit

On May 16, 2008, Plaintiff brought suit against Defendants, the School District and the Board of Education, and other individual defendants.  (Dkt. No. 1.)  As stated *supra* at note 1, even though she originally dismissed all of the claims in this case, Judge Seybert eventually reinstated the ADEA and Title VII claims of age and sex discrimination as against Defendants. Discovery was completed by October 15, 2012.  (Order, dated Aug. 16, 2012.)  The parties fully briefed and filed Defendants' summary judgment motion as of February 28, 2014, presently before the Court.  (Dkt. No. 91.)

## II. Discussion

### A. Legal Standard

Defendants seeking to obtain summary judgment on a "claim" against them must establish that "there is no genuine dispute as to any material fact," and, thus, that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are legally-relevant ones, *i.e.*, facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (White J.). "Genuine" disputes exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the defendants have met their initial burden of showing the *absence* of genuine disputes as to material facts relating to the subject claim, the plaintiff must "designate specific facts showing that there *is* a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (Rehnquist, J.) (emphasis added; quotations omitted). Indeed, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases), *cert. denied*, 524 U.S. 911 (1998).

Importantly, however, "the trial court's task at the summary judgment motion stage of the litigation is *carefully limited* to discerning whether there are any genuine issues of material fact to be tried, *not to deciding them*." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (emphasis added). In the specific context of employment discrimination claims, "because direct evidence of discriminatory intent is rare," an "extra measure of caution," based on "circumstantial evidence" thereof, is warranted before dismissing such claims on summary judgment. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (citing with approval *Gallo*, 22 F.3d at 1224).

## B. ADEA and Title VII Claims

Given the "extra measure of caution" to which Plaintiff's ADEA and Title VII claims of age and sex discrimination are entitled, and the "circumstantial evidence" in support of these claims, the Court, in this case, finds "genuine issues of material fact to be tried." *Holtz*, 258 F.3d at 69; *Gallo*, 22 F.3d at 1224. Accordingly, the Court declines to dismiss these claims on summary judgment.

The manner of proving employment discrimination claims, pursuant to both the ADEA and Title VII, is governed by the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-805 (1973) (Powell, J.). *See id.* (adopting the framework for Title VII claims); *Delaney v. Bank of Am. Corp.*, __ F.3d __, 2014 WL 4377587, at *3 (2d Cir. 2014) (deeming it "well established" that the *McDonnell Douglas* framework extends to ADEA claims, and citing with approval *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010)); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (O'Connor, J.) (assuming, without deciding, that the *McDonnell Douglas* framework developed for Title VII claims is "fully applicable" to ADEA claims).

First, the plaintiff bears the entire burden of proving, *i.e.*, producing evidence and persuading the jury by a preponderance of the evidence, that she has a prima facie case of employment discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine* ("*Burdine*"), 450 U.S. 248, 252-53 (1981) (Powell, J.). "[A] prima facie case consist[s] of four elements: (1) that plaintiff falls *within the protected group*, (2) that plaintiff applied for a position for which [she] was *qualified*, (3) that plaintiff was subject to an *adverse employment decision*, and (4) that the adverse employment decision was made under *circumstances giving rise to an inference of unlawful discrimination*." *E.g.*, *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) (emphasis added). The plaintiff's burden of proving a prima facie case is "not

onerous," *Burdine*, 450 U.S. at 253, and "minimal," at best, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (Scalia, J.).

Second, once a prima facie case has been proved, the burden of producing evidence, but not persuading the jury, shifts to the defendants, and the defendants are required to articulate "some *legitimate, nondiscriminatory reason*" for their adverse employment decision. *Burdine*, 450 U.S. at 253 (emphasis added; quotations omitted). The burden of persuasion, however, "remains at all times with the plaintiff." *Id.* In other words, even though the defendants' burden is to produce evidence of their nondiscriminatory reasons, such evidence is not subject to attack by way of a "credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509; *see also Burdine*, 450 U.S. at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons.").

Should the defendants satisfy their burden of production, the "presumption" of employment discrimination created by the plaintiff's prima facie case is rebutted. *Burdine*, 450 U.S. at 253, 255-56; *see also St. Mary's Honor Ctr.*, 509 U.S. at 506-507 (describing the "presumption" as a "conclusion [of employment discrimination] in the absence of explanation," which the defendants' "explanation" rebuts). At the third and final step of the *McDonnell Douglas* framework, the plaintiff must bear the entire burden of proving that the defendants' nondiscriminatory reasons were mere "*pretext* for discrimination," thus establishing that she was, in fact, discriminated against. *Burdine*, 450 U.S. at 253, 256 (emphasis added); *see Reeves*, 530 U.S. at 143.

Specifically, with respect to ADEA claims, establishing pretext requires proof that the plaintiff's age was a "'*but-for' cause*" of, and not merely one of the contributing motivations behind, the defendants' adverse employment decision, such that the decision "would not have

occurred without it." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009) (Thomas, J.) (emphasis added) (citing with approval *Reeves*, 530 U.S. at 141-43, 147, for this proposition); *Delaney*, 2014 WL 4377587, at *3-4 (emphasis and quotations omitted); *see also Gorzynski*, 596 F.3d at 106 (holding that, whereas previously an ADEA plaintiff could establish pretext by proving that the adverse employment decision which she suffered was "motivated *at least in part* by age discrimination," "*Gross* changes the latter part of this [*McDonnell Douglas*] formulation" by articulating the but-for standard) (emphasis in the original; quotations omitted).[11]

### 1. Step One: Prima Facie Case

Defendants do not dispute that Plaintiff belonged to two "protected group[s]," based on her age ("at least 40 years of age") and sex. *Byrnie*, 243 F.3d at 101; 29 U.S.C. § 631(a); 42 U.S.C. § 2000e-2(a). Nor do Defendants dispute that Plaintiff endured "adverse employment decision[s]," namely, her tenure denial and ensuing termination. *Byrnie*, 243 F.3d at 101; *see, e.g.*, *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011) ("[The defendants] do not dispute that the decisions not to recommend [the plaintiff] for tenure and to recommend the termination of her probationary employment were adverse employment actions."). The only elements of Plaintiff's prima facie case that Defendants dispute are whether she was "qualified for tenure" and "denied tenure under circumstances permitting an inference of discrimination." (Dkt. No. 97 ("Defs. Br."), at 7.)

---

[11] With respect to Title VII claims, it remains enough for the plaintiff to prove that one of her protected characteristics, *e.g.*, sex, was a "motivating factor" that contributed to, even if it was not determinative of, the adverse employment decision. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (Thomas, J.) (quoting 42 U.S.C. § 2000e-2(m)). The defendants, however, may prove, as a "limited affirmative defense" to mitigate damages, that they "would have taken the same action in the absence of the impermissible motivating factor." *Id.* at 94-95 & n.2 (quoting 42 U.S.C. § 2000e-5(g)(2)(B)). *See also Gross*, 557 U.S. at 174 (declining to apply to ADEA claims the congressionally-authorized mixed-motives analysis for Title VII claims).

i.   Qualifications

In terms of qualifications for tenure within elementary schools, the Court should "simply assess whether the plaintiff has demonstrated that [she] held the basic qualifications to be *eligible* for promotion,*" and not "whether the teacher was *entitled* to tenure."  *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151-52 (2d Cir. 2012) (emphasis added) (addressing the qualifications element with respect to FMLA retaliation claims, which also follow the *McDonnell Douglas* framework).  Unlike eligibility for tenure within universities, eligibility for tenure within elementary schools does not depend on whether a "significant portion of the departmental faculty, referrants, or other scholars in the particular field hold a favorable view" of the teacher.  *Id.* at 151 & n.6 (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 94 (2d Cir. 1984), and holding that "*Zahorik* is applicable only in the context of challenges to university tenure denials" and not "tenure denial in an elementary-or-secondary-school context").[12]

The qualifications that made Plaintiff eligible for tenure may be summarized as follows:

- Plaintiff had the same, if not more, credentials to teach music than McCullagh and Uckardes, other probationary music teachers who made tenure.  *See Donnelly*, 691 F.3d at 152 (considering "educational and licensing credentials").  For instance, like McCullagh, Plaintiff had a master's degree and a permanent music teaching certification, yet she also had a degree in music education, not history, and slightly more years of prior music teaching experience with a number of different school districts.  *See supra* Sections I.A & I.D.

- Plaintiff completed her probationary three-year period of teaching, "the necessary period of time to be considered for promotion."  *Donnelly*, 691 F.3d at 152; (*see* Pl. Ex. 17, at 4 (providing that teachers for the School District are "probationary and without tenure" in their "first three (3) years")).

- Apart from a negative observation and annual evaluation by the same school principal, the observations and annual evaluation of Plaintiff's teaching by other school principals were uniformly positive, and "indicate[d] nothing egregious about

---

[12]     *Donnelly*, thus, expressly rejects Defendants' attempt to apply the higher standard from *Zahorik* in this case to undermine Plaintiff's qualifications for tenure.  (Defs. Br., at 7-8.)

[her] performance suggesting that [she] was manifestly unsuitable for promotion." *Donnelly*, 691 F.3d at 152; *see supra* Section I.C.

That the School District "might have [been] led" to "question [Plaintiff's] suitability as a tenured teacher," based on the complaints of three parents about "questionable interactions" with their children, does not disqualify Plaintiff for tenure as a matter of law. *Donnelly*, 691 F.3d at 152. Indeed, Defendants' argument, that these parental complaints both refute Plaintiff's qualifications for tenure and provide the nondiscriminatory reasons to deny her tenure (Defs. Br., at 8-10), runs afoul of the rule that "the qualification prong [of the *McDonnell Douglas* framework] must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (emphasis omitted).

Accordingly, the Court finds a triable issue regarding the qualifications element of Plaintiff's prima facie case.

### ii.  Circumstances Giving Rise to an Inference of Discrimination

As for circumstances that support the inference that a tenure denial was discriminatory,[13] a "reliable indicator of age discrimination" with respect to a prima facie case is "the fact that *a replacement is substantially younger* than the plaintiff." *O'Connor v. Consol. Coin Caterers*

---

[13]     Contrary to Plaintiff's argument (Dkt. No. 93 ("Pl. Opp."), at 8), Principal Hirschfield's comment about Plaintiff being "eccentric," an age-neutral term that can just as easily be ascribed to a young employee, is not a circumstance that creates an inference of discrimination. *See Mitchell v. UBS Servs. USA LLC*, No. 07-CV-1651, 2009 WL 1856630, at *12 (D.N.J. June 26, 2009) ("[A]ll three terms are age-neutral and do not by themselves suggest age bias.") (collecting cases); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (holding that descriptions of the plaintiff as "nice" and "nurturing" "provide[] no evidence of pretext or discriminatory intent" based on sex, because these are "simply not qualities that are stereotypically female"), *cert. denied*, 540 U.S. 811 (2003).

*Corp.*, 517 U.S. 308, 312-13 (1996) (Scalia, J.) (emphasis added) (holding that mere "replacement by someone under 40," but "insignificantly younger" than the plaintiff, is *not* sufficient for a prima facie case; *whereas* replacement by "substantially younger" persons, whether they are over or under 40, is sufficient); *see also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) ("[T]he fact that [the plaintiff who was over the age of 60] was replaced by a 31-year-old is sufficient to give rise to the inference that he was the victim of [age] discrimination."); *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 579 (S.D.N.Y. 2008) (considering the younger individual promoted over the plaintiff for the same employment position to be equivalent to his "replacement").[14]

In this case, Plaintiff's replacement as string instrument teacher and district-wide orchestra conductor was Uckardes[15]—an individual nearly three decades younger than

---

[14]     Defendants rely on *James v. New York Racing Association*, 76 F. Supp. 2d 250 (E.D.N.Y. 1999), a district court decision, to argue that the fact that "Plaintiff was a fifty-six year old female when she was hired," and, thus, already fell within the protected age group, refutes the inference of discrimination based on her replacement by a younger employee. (Defs. Br., at 11.) Such reliance is unavailing. Indeed, the Supreme Court in *O'Connor*, and the Second Circuit in *Schnabel*, both deemed the plaintiff's replacement by younger employees to evidence discrimination, even though the plaintiff was already over the age of 40 when hired. *See O'Connor*, 517 U.S. at 309 (indicating that the plaintiff was hired at 44 years of age); *Schnabel*, 232 F.3d at 85 ("At the time [the plaintiff] . . . was hired, he was 60 years old[.]").

[15]     As Judge Seybert noted at the motion to dismiss stage, "with regard to the fourth requirement of her sex discrimination claim—that the termination occurred under circumstances giving rise to an inference of sex discrimination—Plaintiff meets her burden by a razor thin margin." *Hall*, 2010 WL 2267399, at *2. Now, on summary judgment, Plaintiff does not address this concern. Indeed, as Defendants correctly argue (Defs. Br., at 16), the replacement of Plaintiff by Uckardes, a younger *female* who subsequently received tenure, belies Plaintiff's Title VII claim of sex discrimination. *See, e.g.*, *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 107 (2d Cir. 1989) (dismissing sex discrimination claim, where "women assumed [the female plaintiff's] duties and were hired or promoted to fill other newly created positions in [her] department").

However, although it believes that there is a basis to dismiss Plaintiff's Title VII claim of sex discrimination on summary judgment, the Court declines to do so, because this claim involves the "same factual predicates" as her ADEA claim of age discrimination. *Thibodeaux v.*

Plaintiff—who, unlike Plaintiff, ended up receiving tenure. *See supra* Section I.D. The act of denying Plaintiff tenure and replacing her with a "substantially younger" probationary music teacher and then promoting that teacher to a tenured teaching position supports an inference of discrimination with respect to Defendants' adverse employment decisions, *i.e.*, Plaintiff's tenure denial and termination. *O'Connor*, 517 U.S. at 313.

Age-related statistics, standing alone, might not support an inference of discrimination "in a disparate treatment case involving a single plaintiff," but, paired with other evidence, may also be considered as "part of the overall proof" thereof. *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 876-77 (2d Cir. 1997) (considering the plaintiff's use of "statistics," namely, two charts showing an age drop within the defendants' organization, in support of her ADEA claims); *see also Benedith v. Malverne Union Free Sch. Dist.*, __ F. Supp. 2d __, 2014 WL 4056554, at *24 (E.D.N.Y. 2014) (considering, as "circumstantial evidence" for a prima facie case of race discrimination, the fact that "ten of the eleven District Administrators were white," in addition to the essential fact that "after [the plaintiff's] termination, her job duties . . . were assumed by [another individual], who is white").

Here, whereas Plaintiff was denied tenure at the age of 58, *all* of the probationary music teachers who made tenure *from 2002 to 2010*, and, thus, maintained their teaching positions, were *more than a decade younger* than her. A compelling example captured by this statistic is Plaintiff's assistant, McCullagh, who, apart from being a significantly younger music teacher, made tenure with the same, if not fewer, credentials as, Plaintiff, and similarly positive reviews

---

*Travco Ins. Co.*, No. 13-CV-5599, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014). To steer clear of "another trial in the event that it is determined on appeal" that summary judgment on the Title VII claim was "improperly granted," the Court avoids the "fragmentary disposal" of this claim. *Id.* (quoting *Audi Vision Inc. v. RCA Mfg. Co., Inc.*, 136 F.2d 621, 625 (2d Cir. 1943)).

from the school principals.[16]  *See supra* Section I.D.  Coupled with this statistic, the replacement of Plaintiff by Uckardes, another younger music teacher, provides an even stronger basis for inferring that discrimination played an essential part in Plaintiff's tenure denial and termination. Such an inference is separately supported by evidence of procedural irregularities, as discussed below.

"Procedural irregularities" are circumstances which permit an inference of discrimination, where these irregularities have affected the tenure denial and appear to have been influenced by the alleged discrimination.  *Tori v. Marist Coll.*, 344 F. App'x 697, 701 (2d Cir. Sept. 2, 2009) (citing with approval *Weinstock*, 224 F.3d at 45).  In this case, the irregularities in the number of observations and annual evaluations that Plaintiff received—for instance, none in her first academic year—played a decisive role in her tenure denial.  *See supra* Section I.C.  Had Plaintiff received more of the observations and annual evaluations to which she was entitled, those reviews could have negated the substance and weight of Principal Hirschfield's negative observation and annual evaluation.  Moreover, a reasonable jury could infer that Plaintiff's age was a reason for these irregularities, as evidenced by the fact that McCullagh, who assisted and was nearly three decades younger than Plaintiff, received more, if not all, of his minimum-required observations and annual evaluations.  *See id.*

Accordingly, the Court finds a triable issue regarding the discriminatory inference element of Plaintiff's prima facie case.

---

[16]    The only exceptions to Plaintiff's positive reviews were Principal Hirschfield's negative observation and annual evaluation, both of which were premised on seemingly minor and unsubstantiated parental complaints.  *See supra* Section I.C.

### 2. Step Two: Nondiscriminatory Reasons

Anticipating that Plaintiff would be able to make out a prima face case on summary judgment, which she has, Defendants argue that they based Plaintiff's tenure denial and termination on "legitimate, nondiscriminatory reason[s]," not her age. *Burdine*, 450 U.S. at 253 (quotations omitted); (*see* Defs. Br., at 20). According to Defendants, the bases for their adverse employment decisions were the parental complaints about Plaintiff's teaching, and her response thereto, which Principal Hirschfield reported in her negative observation and annual evaluation of Plaintiff, and during the tenure process, to Superintendent Mucci and the other school principals. (*See* Defs. Br., at 21-23); *supra* Sections I.C & I.D. The existence of complaints and other incidents involving particular teachers provides nondiscriminatory reasons to deny them tenure and order their termination. *See, e.g.*, *Mauskopf v. Dist. 20 of N.Y.C. Dep't of Educ.*, 299 F. App'x 100, 101 (2d Cir. Nov. 10, 2008) (citing "written complaints by students and other teachers alleging verbal abuse and corporal punishment by plaintiff" as nondiscriminatory reasons for her termination).

Accordingly, the Court finds that Defendants have satisfied their burden of production, by submitting nondiscriminatory reasons for Plaintiff's tenure denial and termination.

### 3. Step Three: Pretext

While Defendants argue that their nondiscriminatory reasons were not pretextual, their argument overlooks an important fact: after recommending Plaintiff's tenure denial and termination for reasons unstated, Superintendent Mucci reached out to Principals Hirschfield and Wolk to solicit "reasons/rationale" for the adverse employment decisions that "would hold as

evidence." (*See* Defs. Br., at 23-24); *supra* Section I.D.[17]  This fact, though not direct evidence of discrimination, strongly suggests that Defendants' nondiscriminatory reasons were not the real reasons for denying tenure to, and terminating, Plaintiff.

As the Supreme Court held in *Reeves*, even under the exacting but-for standard applicable to ADEA claims of age discrimination, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  530 U.S. at 141, 148 (indicating that, in considering ADEA claims, age "must have . . . had a *determinative* influence on" the adverse employment decision) (emphasis added) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (O'Connor, J.)); *see also Altomare v. Wells Fargo Sec., LLC*, No. 09-CV-9702, 2012 WL 489200, at *11 (S.D.N.Y. Feb. 15, 2012) (considering evidence that the defendants' nondiscriminatory reasons were "false," in concert with their "alleged pattern of terminating older employees and hiring younger replacements," in finding a triable issue of "pretext for [age] discrimination").  In this case, evidence suggesting that Defendants' "nondiscriminatory" reasons were false might well convince a reasonable jury that the adverse employment decisions were, in fact, motivated by discrimination on the basis of Plaintiff's age.

The falsity of Defendants' explanations for these decisions against Plaintiff is further evidenced by the fact that, following his recommendation that Plaintiff be denied tenure and terminated, Superintendent Mucci seemingly went out of his way to obtain the explanations from

---

[17]      Defendants' reply brief only addresses this fact in a conclusory, and unsatisfactory, fashion.  (*See* Dkt. No. 92 ("Defs. Reply"), at 8 ("Superintendent Mucci . . . relayed the request to his principals, who observed Plaintiff and were in the best position to provide their reasons they recommended tenure be denied.").)

the two school principals, Hirschfield and Wolk,[18] who, in the past, had shown an unbridled eagerness to report on Plaintiff's negative performance. Meanwhile, none of the other school principals who had positive things to say about Plaintiff were asked to explain her tenure denial and termination. *See supra* Sections I.C & I.D. Paired with the facts establishing Plaintiff's prima face case, including that her replacement and the only probationary music teachers who ever made tenure were much younger, "discrimination may well be the most likely alternative explanation." *Reeves*, 530 U.S. at 147; *see supra* Section II.B.1.ii; *see also Gorzynski*, 596 F.3d at 107-109 (finding pretext on summary judgment for purposes of the plaintiff's ADEA claim, where (i) in support of termination, the defendant pointed to a "negative performance evaluation" that "occurred under circumstances suggesting discriminatory motives" and an incident for which it conducted a "questionable" investigation, and (ii) the defendant did not discipline "other younger employees" for similar incidents).[19]

Accordingly, the Court finds a triable issue regarding pretext. Since there remain genuine disputes as to material facts regarding Plaintiff's ADEA claim of age discrimination that preclude summary judgment, the Court declines to dismiss this claim. As discussed *supra* at note 15, the Court also declines to dismiss Plaintiff's more tenuous Title VII claim of sex discrimination.

---

[18] As previously noted, the evidence suggests that Principal Wolk blindly endorsed Principal Hirschfield's negative 2003/2004 annual evaluation of Plaintiff. *See supra* note 8.

[19] *Louis v. Board of Education of the City of New York*, 705 F. Supp. 751 (E.D.N.Y. 1989) (cited by Defs. Br., at 23-24), is distinguishable. *See id.* at 760 (granting summary judgment in favor of the defendant, based on the finding that "complaints lodged against plaintiff by parents and teachers" were non-pretextual reasons for the plaintiff's tenure denial, where "[t]here was *no evidence that the complaints were not genuine or baseless*") (emphasis added). In addition to being factually distinguishable, *Louis* also improperly applied the *Zahorik* standard for *university* tenure denials to the plaintiff's *high school* tenure denial. *Louis*, 705 F. Supp. at 760; *see Donnelly*, 691 F.3d at 151 ("*Zahorik* is applicable only in the context of challenges to university tenure denials[] . . . [and] is inapplicable to high school tenure contexts.").

III. Conclusion

For the reasons set forth above, the Court denies Defendants' summary judgment motion, and declines to dismiss Plaintiff's ADEA and Title VII claims of age and sex discrimination. The parties shall proceed to trial on these claims.

SO ORDERED:

 /s/ Pamela K. Chen   
PAMELA K. CHEN
United States District Judge

Dated: September 26, 2014
  Brooklyn, New York